Joseph A. TERRACCIANO, Plaintiff-Appellant,

v.

McALINDEN CONSTRUCTION CO., Defendant-Appellee.

No. 809, Docket 71–1718.

United States Court of Appeals, Second Circuit.

Argued May 2, 1973.

Decided Sept. 28, 1973.

Paul C. Matthews, New York City, for plaintiff-appellant.

Thomas L. Rohrer, New York City (Healy & Baillie, New York City, of counsel), for defendant-appellee.

Before FRIENDLY and HAYS, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

This is an appeal from a judgment for $5,000 entered in favor of plaintiff-appellant, Joseph Terracciano, against his employer, defendant-appellee, McAlinden Construction Co., on a special jury verdict [1] in a personal injury action

---

* Of the United States District Court for the District of Montana, sitting by designation.

1. The jury found that (1) appellant was a seaman; (2) appellee was negligent; (3) appellant's damages were $50,000; (4) the corporate officers, managing agent and superintendent of appellee did not have privity or knowledge of the negligence which caused the accident; and (5) the value of appellee's vessel after the accident was $5,000.

brought by appellant under the Jones Act (46 U.S.C. § 688)[2] and general maritime law.

### Background Facts

In August, 1967 McAlinden Construction Co. entered into a contract with the Sears Oil Company to deepen a portion of the Hudson River adjacent to the Sears dock at Glenmont, New York. The job was accomplished by drilling holes in the river bed into which explosives were placed and later detonated.

The drilling and loading were done from a 30-foot drilling barge on which were mounted two air-driven drills. The barge was anchored by two cables attached to anchors placed on the river bed and two cables attached to points on the river bank. It was moved by means of a winch with four drums, one for each anchor cable.

At each barge location two rows of five holes each were drilled, with the holes spaced at intervals of about five to six feet. Each hole was loaded immediately after drilling with a charge consisting mainly of Petrogel, an explosive, interlaced with prima-cord, a rope-like detonation-initiating device. Each charge was topped with a canister of Farmex, which is 50% nitroglycerin ("straight") dynamite. The holes were loaded so that the Farmex canisters would extend a few inches above the river bed.

At the end of each day the charges set during the day were detonated by electrically firing two charges. The remaining charges were set off by shock waves from these detonations, a method known as propagation.

This plan of operation was designed by Joseph McAlinden, president of appellee corporation. Merritt McAlinden, another officer of the corporation, represented the company at the job site and was there for the blasting period.

On September 18, 1967 the barge crew consisted of Donald Mathieu, barge-foreman and charge-loaded for one of the drills, Alexander Elcavage, the other loader, and two drillers, Gary Purweiler and Joseph Terracciano, the plaintiff-appellant. A number of holes had already been drilled and loaded. Terracciano was having difficulty with his drill on account of loose rock falling back into the hole he was drilling. Mathieu came to his aid, assumed charge of the drill, and attempted to clear the hole by raising and lowering the drill within the hole.

At this time a 660-foot tanker, the Volvula, was approaching the barge area on its way down stream. When the stern of the Volvula was abreast of the barge there was an explosion beneath the barge. All of the charges were detonated, and the barge occupants were thrown into the air.

Appellant, who was 23 years of age at the time of the accident, sustained permanent crippling foot injuries as a result of the explosion. An attending physician[3] testified that appellant will always have some difficulty in walking and will never be able to stand for long periods, do any heavy lifting, or return to his former occupation as a manual laborer. He can be rehabilitated to do sedentary work, but rehabilitation presents some difficulty due to appellant's below average I.Q. and inability to read at a level higher than normal for a second grade student. He has not been gainfully employed since the accident. At the time of the accident his work expectancy was about 37 years.

2. This section provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply;"

3. Appellant offered the deposition of Dr. Murray Burton, an orthopedic surgeon who treated appellant and to whom he was referred by appellee. Both parties accept Dr. Burton's testimony but differ on the inferences to be drawn therefrom.

### Proceedings in District Court

It was appellant's theory of the case that a wake from the passing Volvula moved the drill barge, causing the end of a drill to wander on the river bottom and strike a loaded hole, detonating the charges contained therein. Appellant contended that (1) the barge was unseaworthy, and (2) appellee was negligent in using a makeshift anchor and sensitive explosives capable of being detonated by shock, and in permitting drilling in close proximity to a loaded hole.

Appellee contended that appellant was not a seaman (to preclude application of the Jones Act) and denied that it was negligent or that the barge was unseaworthy. It contended further that if it were found liable, its liability should be limited under 46 U.S.C. § 183 et seq.[4] to the value of the drilling barge after the explosion on the ground that the cause of the explosion was without the privity or knowledge of appellee's managing officers.[5]

As noted *supra* (note 1), the jury in its special verdict found that appellant was a seaman and that appellee was negligent, but that appellee's officers were without privity or knowledge of the negligent act causing the accident. The jury also found that the barge was seaworthy. Judgment was entered for $5,000, the amount fixed by the jury as the value of the barge after the explo-

sion. Appellant's post-trial motions for a new trial and for a judgment notwithstanding the verdict were denied.[6] This appeal followed.

Appellant contends that (1) there was no substantial evidence to support the jury's finding that the explosion was caused by appellee's negligence without the privity or knowledge of its managing officers; (2) the amount of damages was grossly inadequate; and (3) the court erred in refusing to charge that alleged violations of safety statutes and regulations constituted negligence.

### Limitation of Liability

The crucial question on this appeal is whether appellee sustained its burden of showing that its managing officers were without privity or knowledge of the negligence which caused the explosion. This issue received little attention by either counsel in their closing arguments. The primary thrust of the argument on negligence was whether appellee had taken reasonable precautions in its method of operation [7] and whether appellant had sustained his burden of showing the explosion was caused by appellee's negligence.

At the close of the argument, the court asked appellee's counsel whether his "limitation of liability point [was] out." [8] At the hearing on post-trial motions, the court suggested that he was

---

4. Section 183 provides in pertinent part: "The liability of the owner of any vessel * * * for any act, matter, or thing, loss, damage, or forfeiture done, occasioned, or incurred, without the privity or knowledge of such owner * * * shall not * * * exceed the amount or value of the interest of such owner in such vessel * * *."

5. Appellee had filed a third-party complaint against the owner of the Volvula alleging that the explosion was "caused by the negligence and fault of the Steamship VOLVULA" and its employees "in that, notwithstanding clear and explicit warning, they caused and allowed the VOLVULA to pass the drilling platform at too close a distance, at an excessive speed, with her propellor turning, creating a severe water turbulence and wake which caused the drilling platform to surge and previously loaded explosive

charges to detonate prematurely * * *." Prior to trial the third-party complaint was dismissed without prejudice by stipulation.

6. The court had also denied motions by each party for a directed verdict at the close of the evidence.

7. Likewise the court's charge on the issue of negligence was directed to the reasonableness of the method employed in drilling the holes and detonating the charges.

8. "The Court: Do I take it, Mr. Rohrer, from your summation that your limitation of liability point is out?
"Mr. Rohrer: No.
"The Court: Where is the evidence of the value of the vessel in this case?
"Mr. Rohrer: He testified that as it was pulled out on the bank it would be about $1,500."

not sure the jury understood the issue with respect to negligence without privity or knowledge, stating that "although the Court clearly stressed the point in its charge to the Jury and gave them a guide for criteria, neither Counsel argued the point to the Jury". The court pointed out further that at the request of the jury the charge on this subject was repeated, and the jury returned its verdict some 35 minutes later.

Appellee recognizes that the "particular negligence that the jury found is, of course, not known." Calling attention to the "two modes where the negligence might lay, i. e., the plan and the performance," appellee refers to the fact that "Defendant's counsel earlier suggested to the Court below on the post-trial motions, some seven possibilities of negligence in the performance by the workmen that day." The primary thrust of appellee's argument on appeal, however, is that the accident could not have occurred had Mathieu, the foreman, "kept the 'down' pressure on the inshore drill", and his negligence was not that of a managing agent or superintendent.

Mathieu testified that he had down pressure on the drill and it was in "Down position, against the bottom of the hole" and a wandering drill could not have caused the explosion. He admitted, however, that he had been working the drill up and down just prior to the explosion and testified that "if the

conditions were too rough we would have to [stop drilling]" and that "we weren't loading or permitting anything for the other drill at the time [the ship passed]."

Accepting Mathieu's testimony, Joseph McAlinden testified that a wandering drill steel or sand pipe could not have caused the explosion.[9] Appellee refers in its brief to the "courtroom tension created when the two McAlinden witnesses sought anxiously to avoid stating openly what had become obvious: that if the foreman Mathieu, present in the courtroom, had kept the 'down' pressure on the inshore drill, the accident could not have happened.[10] Merritt McAlinden, the officer of appellee in charge of the job, however, testified that "It was a premature blast and no one knows how or why." Both McAlindens admitted on cross-examination that immediately after the accident they had expressed opinions to the effect that the movement of the barge from the wake of the passing ship had caused the drill steel to wander into an adjacent hole and cause a premature blast.[11]

■■ It is well settled that limitation of liability is an affirmative defense and that the defendant has the burden of proving that its officers and managing agents lack privity or knowledge.[12] In re Marine Sulphur Queen, 460 F.2d 89, 101 (2 Cir. 1972).[13] To sustain its burden of proof a defend-

---

9. "Q. Based on the testimony of your foreman, and based on anything you know about the job, did that drill steel or sand pipe wander causing that explosion?

"A. My opinion is no, sir.

\* \* \*

"The Court: Would that raise up and lower with a wave under the barge?

"The Witness: No, sir, if he had down pressure, which Donny said he had, and the drill was down, the barge would rise and fall but the drill steel itself would stay \* \* \* on the bottom."

10. In his argument to the jury, defendant's counsel *apparently accepted Mathieu's* testimony that he had the drill steel down in the hole and even if the barge lifted it wouldn't have moved.

11. In answers to interrogatories dated April 29, 1970 (almost three years after the accident) and signed by appellee's counsel, the answer to interrogatory 66, "What was the cause of the explosion?" reads: "Defendant believes that the wake of a passing vessel caused a drill to come into contact with a previously loaded charge of explosives."

12. Appellant notes that the court did not charge the jury that defendant had this burden, but concedes that counsel took no exception to the charge.

13. "The right to seek exoneration from or limitation of liability provided in § 183 provides a unique remedy to shipowners. To balance this advantage, the shipowner has the burden of proof to establish that the

ant must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred, a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge. The S.S. Hewitt, 284 F. 911, 912 (S.D.N.Y.1922).[14]

Appellee did not produce any evidence as to the cause of the accident, aside from the inference it now draws from Mathieu's testimony. Appellee's witnesses testified that the explosion was not caused by a wandering drill and that the method appellee followed was safe and reasonable. The only affirmative evidence presented by appellee as to the cause of the accident was Merritt McAlinden's testimony that "It was a premature blast and no one knows how or why."

It cannot be said, as appellee apparently now contends, that it was shown by Mathieu's testimony that the explosion was caused by his negligence in failing to keep the down pressure on the drill. No witness testified that in his opinion this was the cause of the explosion; nor did counsel so contend in his closing argument. On the contrary, appellee's witnesses in their testimony and counsel in his argument accepted Mathieu's testimony that the drill was down when the explosion occurred. No other witness contradicted this testimony.

■ As stated above, Merritt McAlinden, who heard Mathieu's testimony and followed him on the stand, testified that "no one knows how or why" the premature blast occurred. Appellee made no effort to explore and exhaust all possibilities as to the cause of the accident and show lack of privity and knowledge as to each, although at a post-trial hearing, counsel suggested seven possible acts of negligence in performance of the work. Its representative on the job site having claimed ignorance of the cause of the explosion, appellee failed to sustain its burden of proving lack of privity to or knowledge of the cause of the accident.

The court did not charge the jury that the defendant had the burden of proof on the issue of limitation of liability. He expressed some doubt as to whether the jury fully understood this issue, but concluded that "there was evidence from which the jury could have found either way on that point."

The evidence with respect to both issues—negligence and privity and knowledge—leaves much to be desired. Counsel for both parties complain that they were unduly rushed in the trial of the case. Counsel for appellant states that the entire trial, from the selection of the jury through closing arguments, took six hours of trial time and that counsel were repeatedly admonished that they were "taking too long". Counsel for appellee states that appellee began its case at 11:35 A.M.[15] and was required to call three fact witnesses, one expert witness, and read from depositions before the noon recess. He contends that "The rushed summations of counsel could not fully cover all the evidence and points involved in the case."

Appellant contends further that appellee was not entitled to a jury trial on the admiralty defense of limitation of liability. It is true that proceedings for limitation of liability are ordinarily

---

loss of the vessel was occasioned without his privity or knowledge." Petition of Long, 295 F.Supp. 857, 858 (S.D.N.Y.1968), aff'd, 439 F.2d 109 (2 Cir. 1971).

14. As Judge Learned Hand said in *The S. S. Hewitt*, "This, to be sure, he [the owner of the vessel] need not always do by going over the possibilities, item by item. * * * The relevant point is that he undertakes to prove that, whatever the cause of the loss, he was ignorant of it; that burden he undertakes, with all the possibilities which it may involve." 284 F. at 912.

15. It appears from the transcript that at this time the court said: "This case is coming to a conclusion in a half hour, whether you are finished or whether you are not."

tried to the court without a jury.[16] Here, however, the parties expressly stipulated for a trial by a jury of six persons. The form of special verdict submitted to the jury contained eight questions, including two questions relating to the issue of limitation of liability. No exceptions were taken to the form of verdict and no question was raised in the district court with respect to the trial of the limitation issue by a jury.[17]

Because there is no way to determine from the findings below what negligent conduct the jury found to have caused the appellant's injuries, it is impossible to remand solely for a determination of whether the appellee met its burden of proof in establishing that the negligent conduct occurred without the privity or knowledge of its officers or managing agents. We therefore remand the entire case for a new trial.[18]

Reversed and remanded.

16. It has been held that where both a claim in law and a defense in admiralty are asserted, "the rights of the parties may be determined by the jury except for the right to the defense in admiralty which must be determined by the court in admiralty." Famiano v. Enyeart, 398 F.2d 661, 664 (7 Cir. 1968), cert. denied, 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 564 (1969).

17. Where, as here, there are multiple claims and an inadequate fund, the owner of the vessel usually seeks a "concursus" to marshal all claims to ensure an equitable distribution of the fund if the owner establishes his defense of limitation of liability. See Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954); Lake Tankers Corp. v. Henn, 354 U.S. 147, 77 S.Ct. 1269, 1 L.Ed.2d 1246 (1957). Appellee did not seek a concursus in this case.

18. In view of this conclusion it is unnecessary to consider the other contentions on this appeal.