413 So.2d 710 (1982)
FISHBOATS, INC.
v.
Henry Thomas WELZBACHER.
No. 53051.
Supreme Court of Mississippi.
April 21, 1982.
*711 Bryan, Nelson, Allen, Schroeder & Blackstrom, Vincent J. Castigliola, Jr., John A. Banahan, Pascagoula, for appellant.
Cumbest, Cumbest & Hunter, David O. McCormick, John L. Hunter, W. Harvey Barton, Pascagoula, for appellee.
Before SMITH, WALKER and DAN M. LEE, JJ.
DAN M. LEE, Justice, for the Court:
This appeal arises from the Circuit Court of Jackson County wherein Henry Thomas Welzbacher, plaintiff/appellee, instituted suit against Fishboats, Inc., defendant/appellant, for damages sustained due to injuries received while employed as a cook-fisherman aboard the Nuevo, a fishing vessel owned and operated by Fishboats, Inc. The basis of Welzbacher's claim stemmed from the Nuevo's failure to provide him with a reasonably safe place to perform his duties as well as failure of the ship's captain to transport Welzbacher to shore for medical attention following the accident. Welzbacher injured his knee on board the Nuevo, during rough seas, when he went on deck to *712 obtain food from a styrofoam ice chest used to store perishable items prior to their cooking. Following this injury, the meniscus was removed from Welzbacher's knee. Complications subsequently developed and approximately one year later Welzbacher underwent surgery for a partial hip replacement. The jury returned a verdict in favor of Welzbacher and assessed his damages at $200,000. We affirm.
Henry Thomas Welzbacher was employed as a cook on board the vessel Nuevo, a 20-year-old snapper fishing boat. The Nuevo left port on or about December 29, 1978, piloted by Captain Al Krantze. Captain Krantze asserted the weather was not very bad. However, another crew member and Welzbacher testified there was serious question about whether or not to leave port. The weather forecast from Appalachicola to Biloxi, and from Biloxi to Morgan City, and out fifty miles, indicated a small-craft advisory was in effect from December 27 until December 31 with winds varying from fifteen to twenty-five knots and seas ranging from five to ten feet.
Krantze stated that after leaving port, the Nuevo anchored on the bay side of Petit Bois Island for the night and departed therefrom the following morning around seven or eight o'clock. George Edge, a crew member of the Nuevo, stated the Nuevo anchored behind Horn Island on December 27 and left the following morning. Welzbacher agreed the ship left port December 27 and anchored behind Horn Island, but, he asserted, it remained anchored at Horn Island for two days. Both Welzbacher and Edge agreed the injury occurred on December 30. However, according to Krantze and Welzbacher, the ship was running at the time of the accident, while Edge testified the ship was at anchor.
The Nuevo, apparently like most other fishing vessels, was not equipped with electrically-powered refrigeration. The ship was loaded with an average of 32,000 pounds of ice to preserve fish as well as perishable food to be consumed by the crew. To traverse from the galley to the hold where the perishable food was stored, it was necessary to go out on the open deck. For the cook's convenience, an ice chest was used to save the cook from making quite as many trips to the hold for food items. Welzbacher asserted the styrofoam ice chest used during the particular trip was located on the deck of the Nuevo as it had always been since he began working on the Nuevo.
Welzbacher's injury occurred when he went on deck to secure some chickens from the ice chest. When he removed the lid, the wind caught it and blew it into his face, causing him to fall to his knee. Although Captain Krantze did not actually see the fall, he looked back after hearing a noise and saw Welzbacher down on the deck with his knees in the air, holding the lid to the ice chest.
Welzbacher was transported to Galveston, Texas, where he was admitted to the U.S. Public Health Service Hospital on January 7, 1979. There was some testimony concerning the captain's failure to secure medical attention at Welzbacher's request.
Dr. Malcom Wall removed the meniscus from Welzbacher's injured knee, finding numerous signs of erosion on the articulus cartilage both at the femur and tibia as well as signs of degenerated meniscus with frayed edges, and evidence of a large tear in the meniscus that had probably lodged within the joint and caused the knee to lock. Dr. Wall opined the history given by Welzbacher concerning his accident could have produced this injury. Normal recovery from this type of surgery is five months. Welzbacher was started on physical therapy and subsequently discharged February 7, 1979, with an infection, and referred to Dr. Daniel Enger at Pascagoula, Mississippi, for post-surgery therapy.
On February 9, 1979, Welzbacher was treated by Dr. Horn at the Singing River Hospital in Pascagoula. Dr. Enger, an orthopedic surgeon, first saw Welzbacher on February 12, 1979. He was subsequently referred to the U.S. Public Health Hospital in New Orleans where he was admitted March 2, 1979, and diagnosed as having a staphyloccocal infection (staph) of the knee and thigh following surgery. He remained hospitalized until May 1, 1979.
*713 Welzbacher entered the U.S. Public Health Hospital in New Orleans again on May 14, 1979, with pain and swelling in his knee. There was evidence of prior infection which extended into the thigh musculature. An anthrotomy was performed and Welzbacher was subsequently discharged on July 6, 1979. There was no evidence of any femoral neck fracture at this time.
Dr. Douglas Holford saw Welzbacher in November 1979 regarding fusion of his knee. Dr. Holford saw Welzbacher again in December 1979 concerning an increase in pain in his knee and hip. Welzbacher was again admitted to the U.S. Public Health Hospital in New Orleans in January 1980 for a femoral neck fracture. He related his hip cracked shortly after Christmas of 1979 when he stepped off a stair, putting too much weight on his leg. A bone scan revealed no blood had been getting to the head of the right femur, indicating the head was probably not viable. A partial hip replacement was performed. Welzbacher had surgery four times during 1979 and once in 1980 and spent more than 135 days in various hospitals.
All medical experts asserted Welzbacher would never be able to return to his duties as a seaman. However, Dr. Enger, who rated Welzbacher's disability at 100% loss of the use of the leg, asserted he could perform some type of employment and earn at least minimum wage.
The jury returned a verdict in favor of Welzbacher, assessing his damages at $200,000.

I. Did the trial court err in refusing to admit into evidence the complete hospital records of appellee?
Appellant's first proposition revolves around certain hospital records concerning an injury to appellee which occurred on December 23, 1978, just prior to the fishing expedition when appellee injured his knee. From the Singing River Hospital records, it is apparent appellee was admitted to the emergency room, apparently intoxicated, after having been found passed out, with a contusion to the lateral parietal area and to the superior portion of the left ear. He was admitted for observation for a possible cerebral concussion. However, he left the hospital before being seen by a doctor, against medical advice. Laboratory studies showed a blood alcohol content of .4%. Final diagnosis was listed as acute alcohol intoxication, probable cerebral concussion syndrome, mild.
Although there is really no dispute that this fall had anything to do with appellee's knee injury, appellant offered this evidence to show that appellee was more prone to fall following a cerebral concussion. Also, the evidence would have served for some impeachment value because appellee denied he was injured or hospitalized on this date. An objection to the admission of the records was sustained on medical privilege grounds as well as being irrelevant and immaterial to the lawsuit.
Communications between a patient and physician are privileged by Mississippi Code Annotated section 13-1-21 (Supp. 1981). A waiver may occur at the instance of the patient or his personal representative following his death. A waiver of the privilege also occurs where a plaintiff in a personal injury suit voluntarily exhibits the injured portions of his body to the jury for inspection. In Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938), this Court stated:
Appellee says, however, that the court was in error in ordering the examination and that the testimony of the specialist should, therefore, be disregarded; that the order is not sustained by the holding of this court in Dixie Greyhound Lines, Inc., v. Matthews, 177 Miss. 103, 170 So. 686. In that case, at page 115 of 177 Miss., 170 So. 686, 688, the court quoted, with approval, as follows: "An examination of the cases will show that the courts have uniformly held that, where a plaintiff in a personal injury suit voluntarily exhibits the injured part of his body to the jury for inspection, the portion of his body so exhibited becomes an exhibit in the case, like any other object or thing introduced in evidence, and the opposite *714 party has the right to make such inspection of it as will enable him to explain, criticize, or impeach its value as evidence, and to that end have it examined by experts." The other approved quotations in the opinion are to the same effect. That opinion was prepared after a long and most thorough consideration by the entire court, and we will not take it to pieces by technical refinement of argument in subsequent cases. (183 Miss. at 647-48, 179 So. at 749)
See also Dennis v. Prisock, 254 Miss. 574, 181 So.2d 125 (1965); and Greyhound Lines, Inc. v. Matthews, 177 Miss. 103, 170 So. 686 (1936).
By exhibiting his knee to the jury, appellee waived any medical privilege as to that portion of his body. However, no such waiver occurred as to any treatment appellee may have received to other portions of his body.
When the records were proffered and Dr. Enger was questioned by the court, the following colloquy transpired:
BY THE COURT: I am asking him, though, can he testify as to the probability that the head injury on December 23rd had anything to do with the subsequent fall or alleged fall and injury on the 30th. Is there any way you could testify to that?
BY THE WITNESS: I could not give it in a real percentage ... to make it a real possibility.

(emphasis added.)
Any connection between the two incidents was very speculative. Therefore, the admission of the records would have been more prejudicial than probative in value. Furthermore, appellee was not examined by a physician on December 23, 1978, but left the hospital before being treated, against medical advice. The hospital records concerning the December 23, 1978, injury were, therefore, properly excluded.

II. Did the trial court err in refusing appellant's instruction D-25?
Instruction D-25 provided:
The Plaintiff may invoke the medical privilege and prevent any physician who has treated him from testifying or prevent the introduction into evidence of records of said treatment. When the Plaintiff claims this medical privilege, the Defendant cannot compel a treating physician to testify or introduce into evidence records of that treatment.
The Plaintiff has invoked the medical privilege in this case and prevented the testimony of Dr. Charles Allen and Dr. J.S. Weatherall and also the Plaintiff has prevented the introduction into evidence of records of the Plaintiff's medical records regarding medical treatment which the Plaintiff Henry Thomas Welzbacher, may have received on December 23, 1978.
As the Plaintiff has so used the medical privilege, you as jurors are warranted in inferring that the testimony of Dr. Allen and Dr. Weatherall and the medical records regarding such treatment would have been unfavorable to the Plaintiff should the doctors had (sic) been permitted to testify or the records introduced into evidence.
An objection to the instruction was interposed and sustained on the grounds that the instruction was a misstatement of the law and that the December 23, 1978, records were not admitted into evidence.
In Killings v. Metropolitan Life Insurance Co., 187 Miss. 265, 192 So. 577 (1940), this Court first upheld the granting of the following instruction:
In that state of case the court, at the instance of appellee, instructed the jury that under the law it could not introduce as a witness "any doctor to testify to anything learned by him of the plaintiff's physical condition while the relation of physician and patient existed between him and plaintiff", and further instructed the jury that the fact that appellant failed to introduce as a witness one of his physicians, Dr. Waldrup, would justify the jury in inferring that his testimony would have been unfavorable to the appellant... .
(187 Miss. at 271, 192 So. at 578).
*715 However, the instruction in the present case goes farther than what was contemplated in the Killings decision. In McCay v. Jones, 354 So.2d 1095 (Miss. 1978), this Court stated:
In our case the defendant obtained an instruction that plaintiff had the right to claim as privileged the communication between her and the two physicians sought to be called as witnesses, but when she claimed the privilege, the jury could infer that, if the physicians were permitted to testify, their testimony would have been adverse to the interest of the plaintiff. This instruction was first authorized by our decision in Killings v. Metropolitan Life Ins. Co., 187 Miss. 265, 192 So. 577 (1940).
We hold that it was error to sustain the motion in limine because the privileged communication statute between physicians and patients does not make a physician incompetent as a witness for all purposes, but only prevents the physician from testifying as to any privileged communication. There are competent questions, which may be asked of an attending physician, which fall outside the prohibition of the statute. When the court denied defendants the right to subpoena and introduce otherwise competent witnesses, this extended the privileged communication statute more than the legislature intended.
(354 So.2d at 1100)
See also Gulf, Mobile & Ohio R. Co. v. Smith, 210 Miss. 768, 50 So.2d 898, 899 (1951).
The instruction in the present case incorrectly informed the jury that appellant could not compel appellee's physician to testify. Neither Dr. Charles Allen or Dr. J.S. Weatherall actually treated Welzbacher because he left the hospital before they had the opportunity. Furthermore, neither was called as a witness. It appears as though the appellant wanted to elicit testimony concerning appellee's state of intoxication on December 23, 1978. Although no testimony concerning privileged communication could have been elicited, the physician was not an incompetent witness for all purposes. In fact, appellant could have used the physician to impeach appellee's testimony that he was not admitted to the hospital on December 23, 1978. The instruction was properly refused as a misstatement of the law.

III. Was the jury verdict excessive?
46 U.S.C.A. section 688, authorizes recovery of damages for personal injuries received by a seaman in the course of his employment. 2 Norris, The Law of Seamen section 690 (3d Ed. 1970), provides:
§ 690. Negligence.  The seaman's calling is a hazardous one in which he faces on the one hand the dangers of the natural elements, and on the other, the requirements of ship's discipline which may expose him to those elements by requiring him to obey orders against perhaps his better judgment.
Recognizing the peculiar hazards of the seaman's vocation and having in mind the purpose for which the Jones Act was enacted, the United States Supreme Court avoided giving "negligence" a narrow, restricted and technical meaning. It left the interpretation of negligence to the courts to construe that word liberally so as to include all the meanings given to it in the light of the peculiar hazards of the seafaring profession.
Any negligence on the part of an employer under the Jones Act which plays any part, however slight, in producing an injury to an employee is sufficient to fix liability for such injuries.
The mere fact that a seaman has suffered an injury does not per se call for Jones Act liability, if employer negligence has not been found to exist.
There are two requirements that must be satisfied in order to maintain a Jones Act suit; (a) there must have been a negligent action on the part of the employer; and (b) the act must have contributed to the injury provided first that the injured party was a "seaman" and that the negligent defendant or respondent was the seaman's employer.

*716 Negligence is the gravamen of a suit under the Jones Act, and that negligence must be alleged and proved by the seaman.
The seaman must prove the existence of a duty, the negligent violation of this duty by his employer, and finally, a causal relationship of the violation to the injury sustained.
The jury plays a pre-eminent role in a Jones Act case.
Liability of a shipowner under the act may be predicated upon negligent conduct of its officers, agents or employees, or from defects in the ship, or its equipment or appliances, attributable to the owner's negligence. 32 Am.Jur.2d, Federal Employer's Liability Act § 54 (1982). There must be a causal relationship between the owner's failure to exercise due care and the resulting injury. In Rogers v. Missouri-Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the test of a causation was espoused as:
Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal, and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due "in whole or in part" to its negligence. (Emphasis added.)
(352 U.S. at 506-07, 77 S.Ct. at 448-49, 1 L.Ed.2d at 499-500) (emphasis added.)
In the case at bar, it was undisputed that appellee fell and injured his knee in the course of his employment on board the Nuevo. Although one doctor asserted that the meniscus ordinarily locks and causes the fall, Dr. Wall testified that if appellee's history was true, his injury could have resulted from the fall. Marine forecasts indicated inclement weather conditions when the Nuevo left port as well as leading up to the time of appellee's injury. There was expert testimony that the Nuevo was not reasonably safe on December 30, 1978, regarding the installation of the ice cooler on the deck of the vessel. In fact, the only major controverted issues were the length of time that elapsed following appellee's injury before he was brought in for medical attention and the connection between the original knee injury and the subsequent hip replacement. Submission of Jones Act claims requires a very low evidentiary threshold; even marginal claims are properly left for jury determination. Smith v. Massman Const. Co., 607 F.2d 87 (5th Cir.1979); and Leonard v. Exxon Corp., 580 F.2d 522 (5th Cir.1978).
Following appellee's injury and subsequent hip surgery, it is clear that appellee is precluded from sea duty or any activity which requires climbing. Although Dr. Enger asserted appellee would be able to find gainful employment for at least minimum wage, appellee's disability to his injured leg was rated at 100% loss of use of that leg. This disability was broken down into 60% disability due to the knee injury and 40% disability due to the hip injury.
According to Dr. Holford, the infection in appellee's knee spread into his thigh causing a weakness of all tissue. Dr. Holford, who performed the hip replacement, opined that the nonviability of the hip bone was due to a lack of blood supply in that area. Dr. Enger succinctly summed up the appellee's condition following his initial injury when he testified:
If there has been no other factor involved, I would say that there is a ... it's *717 almost like the domino theory where one thing starts to go wrong and then everything seems to happen in this case. Certainly not saying that it does not happen to a surgeon that he gets a post-operative wound infection, these things will happen in the operating room. Then you get a fibrosis, a scarring in there. And then you come along with the man who is not ambulatory and, if he's been taking care of himself and everything else and there is no other factors which can be established, then it's just an unfortunate situation which develops. But, it's almost like Murphy's law  if there's a weak spot in the system, it's going to find it and it's all going to come up.
Other doctors denied that the hip replacement was caused by the initial knee injury. All the experts seemed to agree that appellee's knee was degenerated to some extent prior to the injury and that the future condition of appellee's hip uncertain.
The jury was instructed to consider damages to appellee's hip if it believed from a preponderance of the evidence that the original knee injury predisposed appellee to infection and disease to the hip. The jury evidently so found as evidenced by the size of its award.
Subsequent to appellee's knee injury, he spent 95 days during 1979 and 45 days during 1980 in various hospitals. There was evidence of personality changes as well as pain and suffering following the accident. Appellee is no longer able to resume sea duty but is now confined to light work.
The jury, based upon conflicting expert testimony as to the causation of the hip replacement, awarded appellee $200,000. Based upon this record, we cannot say this verdict was excessive so as to evidence passion, bias and prejudice.

IV. Did the trial court err in denying appellant's defense of limitation of disability?
46 U.S.C.A. section 183, provides:
(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
(b) In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) of this section is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less than $60 per ton of such vessel's tonnage, such portion shall be increased to an amount equal to $60 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts.
(c) For the purposes of this section the tonnage of a seagoing steam or motor vessel shall be her gross tonnage without deduction on account of engine room, and the tonnage of a seagoing sailing vessel shall be her registered tonnage. Provided, that there shall not be included in such tonnage any space occupied by seamen or apprentices and appropriated to their use.
(d) The owner of any such seagoing vessel shall be liable in respect of loss of life or bodily injury arising on distinct occasions to the same extent as if no other loss of life or bodily injury had arisen.
(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

*718 (f) As used in subsections (b), (c), (d), and (e) of this section and in section 183b of this title, the term "seagoing vessel" shall not include pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, nondescript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels, even though the same may be seagoing vessels within the meaning of such term as used in section 188 of this title. R.S. § 4283; Aug. 29, 1935, c. 804, § 1, 49 Stat. 960; June 5, 1936, c. 521, § 1, 49 Stat. 1479.
Testimony as to the value of the Nuevo and its cargo was offered outside the presence of the jury. The fair market value of the Nuevo was established at $35,000. The cargo or fish at the time of the accident was valued at $800. A motion, subsequent to the verdict of the jury concerning the limitation of liability defense, was heard by the trial judge.
Ralph Douglas Horn, part owner of Fishboats, Inc., admitted he knew the ice box was placed on the deck and allowed it to remain there. He also admitted that a seaman was more likely to be injured if he went on board during bad weather. Horn testified the captain of the Nuevo worked for Fishboats, Inc., and Fishboats could control whether or not he left port. He qualified his statement by saying he left it to the captain's discretion as to whether or not the boat left port.
In Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943), the Supreme Court held the burden was upon the party seeking to invoke limitation of liability. In Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151 (2d Cir.1978), the Second Circuit Court of Appeals stated:
In a limitation proceeding such as this, the burden of proof as to the absence of privity or knowledge is on the petitioners, Red Star. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). It is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity. Terracciano v. McAlinden Construction Co., 485 F.2d 304 (2d Cir.1973); Re Reichert Towing Line, 251 F.2d 214 (2d Cir.), cert. denied, 248 U.S. 565, 39 S.Ct. 9, 63 L.Ed. 424 (1918).
Seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion. The Niagara v. Cordes, 62 U.S. (21 How.) 7, 16 L.Ed. 41 (1859); The Framlington Court, 69 F.2d 300, 304 (5th Cir.), cert. denied, 292 U.S. 651, 54 S.Ct. 860, 78 L.Ed. 1500 (1934); Adams v. Bortz, 279 F. 521 (2d Cir. 1922); Northern Commercial Co. v. Lindblom, 162 F. 250 (9th Cir.1908). The burden to prove seaworthiness and the exercise of due diligence to make the ship seaworthy is upon the vessel owner or operator. Terracciano v. McAlinden Construction Co., supra. Red Star had a non-delegable duty to provide a qualified master and crew for the intended voyage. Boudoin v. Lykes Brothers Steamship Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); Petition of the United States, 178 F.2d 243, 252 (2d Cir.1949). See, Admiral Towing Co. v. Woolen, 290 F.2d 641, 646 (9th Cir.1961); Navegacion Castro Riva v. The M.S. Nordholm, 178 F. Supp. 736, 741, n. 19 (E.D.La. 1959), aff'd, 287 F.2d 398 (5th Cir. 1961). If then, the Ocean Prince was manned by an inadequate crew, Red Star's duty as shipowner was breached on either the theory of negligence or that of unseaworthiness. Incompetence of the navigator makes the vessel unseaworthy. Empire Seafoods, Inc. v. Anderson, 398 F.2d 204 (5th Cir.), cert. denied, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968).
(584 F.2d at 1155-56)
The Fifth Circuit Court of Appeals has also ruled on limitation of liability in In Re Brasea, Inc., 583 F.2d 736 (5th Cir.1978), wherein it stated:

*719 We cannot agree. In ascertaining whether a shipowner is entitled to limitation, the Court must first determine which act or acts of negligence or conditions of unseaworthiness caused the injury. The Court then determines whether the shipowner had knowledge or privity of these specific acts or conditions. Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir.1976).
(583 F.2d at 738)
See also Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir.1976).
The trial judge made a factual finding denying the limitation of liability defense on the ground that the owners of the Nuevo had general knowledge of the condition aboard the ship which rendered the vessel unseaworthy. After reviewing the record, we are unable to say the trial judge's findings on the issue are unsupported by substantial evidence. There is no merit in this argument.

V. Did appellee's expert invade the province of the jury?
Appellant contends the trial court erred in allowing John Kern to express an opinion as to the reasonable safeness of the vessel on the day the injury occurred.
In Ford Motor Co. v. Dees, 223 So.2d 638 (Miss. 1969), a products liability case, this Court stated:
We feel that Alvin Doyle was qualified by his thirty years experience as part owner and manager of a large automotive repair shop to testify as an expert on the construction and working of the steering mechanism of a pickup truck and also the manner in which the cab was bolted to the chassis. He was qualified to point out to the jury how the steering column would separate and cause the steering mechanism to fail if there was play between the cab and chassis.
He did aid the jury with his expert knowledge, but he did not invade the province of the jury and furnish them the ultimate answer. He did offer, and we think rightly so, some light on the subject of the actual assembly and working of the steering mechanism.
(223 So.2d at 641)
This Court has also held that opinion testimony of one who has acquired special knowledge of a subject, either by study, training or practical experience, may impart to the jury such acquired knowledge so as to aid it in determining an issue with which the jury is not familiar. Bynum v. Mandrel Industries, Inc., 241 So.2d 629 (Miss. 1970).
The hypothetical question propounded to John Kern as well as the answer given in response thereto did not invade the province of the jury. The ultimate issue to be determined by the jury was the seaworthiness of the vessel and not the condition and location of the ice chest on board the ship. John Kern's opinion was merely to the effect that the installation of the ice chest aboard the Nuevo was not reasonably safe. It was for the jury to determine whether the condition and installation of the ice chest rendered the vessel unseaworthy, and such condition contributed to the injury of the appellee. We find no error in the propriety of the hypothetical question and answer.

VI. Did the trial court err in limiting appellant's right to cross-examination?
Although as a general rule great latitude is permissible on cross-examination, the scope thereof is not without limitation. Questions intended to embarrass or humiliate a witness as well as those extending to irrelevant matters, are not permissible. The scope of examination is largely within the sound judicial discretion of the trial court and it has the inherent power to limit examination to relevant factual issues. Hankins v. State, 288 So.2d 866 (Miss. 1974). Aimless repetition and references to immaterial and inflammatory matters should also be avoided. Isaacks v. State, 337 So.2d 928 (Miss. 1976).
The record in the present case does not support appellant's contention that its right of cross-examination was limited by the trial court. In all the instances complained of, valid objections were interposed and ruled upon by the trial judge. Appellant *720 does not complain of the trial judge's rulings on the admissibility of these matters. We find no merit in this argument.
For the foregoing reasons, the judgment of the Circuit Court of Jackson County should be and the same is hereby affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH and SUGG, P. JJ., and WALKER, BROOM, ROY NOBLE LEE, BOWLING and HAWKINS, JJ., concur.