<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1088

                        PATRICK J. CARR,

                     Plaintiff, Appellant,

                               v.

        PMS FISHING CORPORATION AND F/V JANE AND URSULA,

           HER GEAR, TACKLE, AND APPURTENANCES, ETC.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

        [Hon. Robert B. Collings, U.S. Magistrate Judge]

                             Before

                     Selya, Circuit Judge,
                                
                  Cyr, Senior Circuit Judge,
                                
                  and Lipez, Circuit Judge.
                                
                                
                                
    Joseph G. Abromovitz, with whom  George F. Leahy, Marsha A.
Morello, and Abromovitz & Leahy, P.C. were on brief, for appellant.
    Brian B. Kydd, with whom Paul Antinori and Kneeland & Kydd
were on brief, for appellees.

August 30, 1999

                                

 SELYA, Circuit Judge.  Like Venus, this appeal arises
full-grown from the sea.  In the underlying case, a shipowner, PMS
Fishing Corporation (PMS), responded to the sinking of its vessel
and an injured seaman's ensuing suit by invoking the Limitation of
Liability Act, 46 U.S.C. app.  181-196 (Supp. 1999).  The
district court granted PMS the protection it sought.  The seaman
appeals, averring that the trial judge misconstrued the burden of
proof applicable to limitation of liability (LOL) proceedings and
erred in finding that the shipowner lacked  privity and knowledge
of the vessel's unseaworthiness.  Discerning no error, we affirm.
                               I
 We start with the facts.  Plaintiff-appellant Patrick J.
Carr, along with two investors (Mark Bergeron and Norville
Stanley), established PMS in October 1991.  PMS then purchased the
F/V JANE & URSULA, a veteran wooden-hulled scalloper.  Bergeron and
Stanley each owned 25% of PMS's issued and outstanding stock, and
Carr   an experienced commercial fisherman who was to oversee
operations and captain the vessel   held the balance.
 Although a shoreside survey conducted in March 1991 had
declared the F/V JANE & URSULA to be in generally good condition,
she leaked in the bow on her first voyage under PMS's auspices.  
PMS had the vessel hauled out and extensively refurbished by a
reputable shipyard and master carpenters, under Carr's personal
supervision.  On her next trip, Carr thought that she handled well,
but he and the crew noticed some seepage around the rudder flange
and along the rub rail, as well as minor leaking near the cutting
box.  PMS again had the vessel hauled out, inspected, and repaired.  
As on the earlier occasion, the rehabilitative work was performed
by a reputable shipyard and master carpenters.
 After Carr pronounced himself satisfied with the repairs,
PMS put the ship back into service.  When Carr took her to sea on
December 14, 1991, the crew, under his direction, checked
repeatedly for leaks.  They discovered none during the first
twenty-two hours of the voyage.
 Around noontime on December 15, the bilge alarm sounded.  
Inspection revealed water in the engine room up to the floorboards.  
When pumping proved futile, Carr notified the Coast Guard, which
began to evacuate the crew by means of a basket suspended from a
helicopter.  As the ship's captain, Carr was the last to depart.  
With no one left to hold the basket's tether and winds of gale
proportions blowing, the basket swung into the rigging, its cable
snapped, and Carr sustained serious injuries when it tumbled to the
deck.
 Carr subsequently sued PMS, charging negligence and
unseaworthiness.  PMS stipulated that the ship was unseaworthy at
the time of the mishap and the negligence count (brought under the
Jones Act) dropped out of the case.  After a seven-day trial, the
presiding magistrate judge, see 28 U.S.C.  636(c), with the aid of
an advisory jury, see Fed. R. Civ. P. 39(c), found that the
vessel's unseaworthy condition proximately caused Carr's injuries.  
Accordingly, he adjudged PMS liable.
 In the ensuing LOL proceeding, the parties submitted
additional evidence.  The judge reserved decision and later wrote
a thoughtful rescript.  In it, he found that PMS lacked both
privity to and knowledge of the vessel's unseaworthy condition and
limited PMS's liability to the vessel's current value.  Since the
F/V JANE & URSULA had ended the voyage on the ocean floor, it had
no ascertainable worth.  Thus, Carr took nothing.
                               II
 Before scrutinizing the trial court's rulings, we
summarize certain maritime principles that pertain here.
 Under federal admiralty law, a shipowner owes its crew a
seaworthy vessel.  See Seas Shipping Co. v. Sieracki, 328 U.S. 85,
90 (1946).  To satisfy this obligation, the vessel must be  
reasonably fit for its intended use.  See Mitchell v. Trawler
Racer, Inc., 362 U.S. 539, 550 (1960); Ferrara v. A. & V. Fishing,
Inc., 99 F.3d 449, 453 (1st Cir. 1996).  As Justice Harlan
elucidated the concept in an oft-quoted passage, the ship must be
"one that is staunch and strong, that is fitted out with all proper
equipment and in good order, and that carries a sufficient and
competent crew and complement of officers."  Gutierrez v. Waterman
S.S. Corp., 373 U.S. 206, 216-17 (1963) (Harlan, J., dissenting).  
A shipowner is absolutely liable for injuries arising from the
vessel's unseaworthiness.  See Mitchell, 362 U.S. at 549; Seas
Shipping, 328 U.S. at 94.
 The Limitation of Liability Act, excerpted in the
margin, cabins this liability.  It provides, in general terms,
that an owner's liability cannot exceed the value of its interest
in the vessel (and her freight, then pending).  The interest is to
be valued as of the end of the voyage on which the loss or damage
occurs.  See Petition of Zebroid Trawling Corp., 428 F.2d 226, 228
(1st Cir. 1970) (citing The City of Norwich, 118 U.S. 468, 490
(1886)); 3 David E.R. Woolley, Benedict on Admiralty  63, at 7-29
through 7-30 (7th ed. 1998).
 If the owner-friendly Limitation of Liability Act is
viewed as an exception to the rule of absolute liability for
unseaworthiness, there is an exception to the exception:  this
limitation applies only if the shipowner lacked "privity or
knowledge" of the act or condition that caused the injury.  46
U.S.C. app.  183(a).  "Privity or knowledge" can be actual or
constructive.  See Spencer Kellogg & Sons, Inc. v. Hicks, 285 U.S.
502, 512 (1932).  Either way, the term usually implies some degree
of culpable participation or neglected duty on the shipowner's
part:  that, for example, it committed a negligent act, or knew of
an unseaworthy condition but failed to remedy it, or through the
exercise of reasonable diligence could have prevented the
commission of the act or the onset of the condition.  See Coryell
v. Phipps, 317 U.S. 406, 411 (1943); Joia v. Jo-Ja Serv. Corp., 817
F.2d 908, 913 (1st Cir. 1987).
 LOL proceedings lend themselves to a bifurcated analysis.  
See Estate of Muer v. Karbel, 146 F.3d 410, 415-16 (6th Cir. 1998)
(collecting cases); Joia, 817 F.2d at 912.  First, the court must
determine whether negligence or unseaworthiness caused the
accident.  Second, the court must determine whether the shipowner
was privy to, or had knowledge of, the causative agent (whether
negligence or unseaworthiness).  When a corporation owns the
vessel, the test is whether culpable participation or neglect of
duty can be attributed to an officer, managing agent, supervisor,
or other high-level employee of the corporation.  See Coryell, 317
U.S. at 410-11; Cupit v. McClanahan Contractors, Inc., 1 F.3d 346,
348 (5th Cir. 1993); Empresa Lineas Maritinas Argentinas, S.A. v.
United States, 730 F.2d 153, 155 (4th Cir. 1984).  In all events,
an entitlement to limitation requires an antecedent finding that
the vessel owner was not privy to, and had no knowledge of, the
decisive act of negligence or condition of unseaworthiness.
 LOL proceedings engender a divided burden of proof.  The
claimant bears the initial devoir of persuasion vis--vis
negligence and unseaworthiness.  See EAC Timberland v. Pisces,
Ltd., 745 F.2d 715, 720 (1st Cir. 1984).  If the claimant succeeds
in that first-stage endeavor, the burden then shifts to the
shipowner to establish its lack of privity and knowledge.  See
Coryell, 317 U.S. at 409; Hercules Carriers, Inc. v. Claimant State
of Fla., 768 F.2d 1558, 1564 (11th Cir. 1985).  Both the claimant's
and the shipowner's burdens contemplate proof by a fair
preponderance of the evidence.
                              III
 In the case at hand, the parties stipulated that the F/V
JANE & URSULA  was unseaworthy when she sank.  The trial court
readily concluded that this unseaworthiness proximately caused
Carr's injuries and that liability existed.  Neither side contests
that ruling, but Carr appeals from the court's second-stage
determination that PMS satisfied the requirements for a statutory
limitation of its liability.  His appeal rests on two grounds.  
First, he claims that the court misapprehended the burden of proof
and, accordingly, that PMS never proved that it lacked knowledge of
unseaworthiness.  Second, he calumnizes the court's factual
findings, especially the finding that the vessel was seaworthy when
it set sail on December 14, and asks us to find the facts
differently.  Both arguments lack force.
                               A
 Carr first asseverates that the trial court misapplied
the law because it did not require PMS to prove that it lacked
knowledge of the specific condition of unseaworthiness that
precipitated the sinking. To the extent that this asseveration
presents a question of law as opposed to a question of fact, it
sparks de novo review.  See United States v. Conley, 156 F.3d 78,
82 (1st Cir. 1998); McCarthy v. Azure, 22 F.3d 351, 354 (1st Cir.
1994).
 In mounting this challenge, Carr notes that neither PMS
nor the magistrate identified any particular condition of
unseaworthiness as having caused the vessel to sink.  Building on
that foundation, he relies mainly on language gleaned from
Terracciano v. McAlinden Constr. Co., 485 F.2d 304 (2d Cir. 1973),
in which the Second Circuit stated that, to shoulder its burden of
proof at the second stage of an LOL proceeding,
   a defendant must show how the loss occurred,
 together with its lack of privity to or
 knowledge of the asserted cause.  If it cannot
 show how the loss occurred, a defendant must
 exhaust all the possibilities, and show that
 as to each it was without the requisite
 privity or knowledge.

Id. at 307-08.  This language, however, cannot be taken literally.  
By its own admission, the Terracciano court based its statement on
an earlier opinion.  See id. at 308 & n.14 (citing and quoting The
S.S. Hewitt, 284 F. 911 (S.D.N.Y. 1922)).  In that seminal case,
Judge Learned Hand made it quite clear that, to achieve a
limitation of liability, a shipowner need not "go[] over the
possibilities, item by item."  The S.S. Hewitt, 284 F. at 912.  
Rather, the shipowner must "undertake[] to prove that, whatever the
cause of the loss, he was ignorant of it; that burden he
undertakes, with all the possibilities which it may involve."  Id.  
Judge Hand's opinion is proof positive that the literalist spin
that Carr places on Terracciano is not the law.
 The rule to which we subscribe is that, at the second
step of the LOL analysis, the trier must determine whether the
shipowner was privy to, or had knowledge of, the particular act of
negligence or condition of unseaworthiness that the claimant proved
in the first stage.  See Suzuki of Orange Park, Inc. v. Shubert, 86
F.3d 1060, 1062 (11th Cir. 1996); Joia, 817 F.2d at 912; see also
3 Benedict on Admiralty, supra, 91, at 8-167 (describing as
"better reasoned" the rule that, "[w]here some fault is shown, the
petitioner then bears the burden of proof to show its lack of
privity in or knowledge of that fault") (emphasis supplied)
(citing, inter alia, Porto Rico Lighterage Co. v. Capitol Constr.
Co., 287 F.2d 507 (1st Cir. 1961)).  As Judge Brown so eloquently
put it, only those specific actions that a claimant submitted to
the jury in the liability phase can "afford the basis for inquiry
as to privity and knowledge."  Avera v. Florida Towing Corp., 322
F.2d 155, 159-60 (5th Cir. 1963).  In that sense, then, the
specificity of the claimant's proof in the first stage of the LOL
proceeding determines the level of specificity at which the
defendant's second-stage proof must operate.
 It follows that where, as here, there is a general
finding of unseaworthiness in the first stage of an LOL proceeding,
the shipowner's proof concerning privity and knowledge suffices as
long as the shipowner shows by a fair preponderance of the evidence
that it took appropriate steps to ensure, and reasonably believed,
that "the ship was well found, properly manned, and staunch, tight,
and adequately equipped."  The S.S. Hewitt, 284 F. at 912.  That
showing need not be made mechanically, checking off each and every
conceivable cause of the loss, but, rather, permits a more global
approach   one that entails an overall sifting and weighing of the
relevant evidence.  See id.
 In the instant case, the ship sank.  There was evidence
that water filled the engine room, thus affording some indication
of the whereabouts of a specific leak.  But the crew members who
testified could not pinpoint the leak's location.  On this record,
then, the general cause of the sinking   unseaworthiness   was
known, but no more specific cause could be ascertained.  Faced with
this evidentiary predicate, the trial court appropriately addressed
the question of whether the shipowner lacked any actual or
constructive knowledge of the vessel's generic unseaworthiness, or,
to use Judge Hand's language, whether the shipowner, "whatever the
cause of loss, . . . was ignorant of it."  Id.  The court then
answered this query affirmatively.  We think that once Terracciano
is put into context, it supports, rather than undermines, this
approach.  Moreover, as long as they are supported by the record,
the court's findings are adequate to bottom a limitation of
liability, without requiring PMS to go further and show that it
lacked knowledge as to any and all possible causes of the sinking.
                               B
 This brings us to Carr's other assigned error:  his claim
that the trial court's factual findings were clearly erroneous.  
The applicable standard of review is forbidding; an appellate court
will disturb findings made by a judicial officer at a bench trial
only if, after reviewing the record as a whole, it comes away with
an abiding conviction that the factfinder stumbled badly.  See
Reliance Steel Prods. Co. v. National Fire Ins. Co., 880 F.2d 575,
576 (1st Cir. 1989); see also Fed. R. Civ. P. 52(a).  Perscrutation
of the record in this case yields no such conviction.
 The record contains testimony from which a factfinder
reasonably could conclude that PMS purchased a used vessel that it
reasonably believed was sound; that when problems developed, it
commissioned inspections and repairs by competent professionals;
that it accepted the advice of those professionals; that PMS spent
nearly $100,000 on repairs in a period of approximately two months;
and that, when the ship sailed on December 14, 1991, the owner
reasonably believed that she was problem-free.  The record also
contains ample evidence that PMS exercised due diligence in looking
after the seaworthiness of the F/V JANE & URSULA and that its
principals had no way of knowing that she was unseaworthy (or would
soon become so) when she left port on December 14.  This evidence
includes indisputable proof that PMS arranged for multiple
inspections, by well-credentialed inspectors, before the final
launch; that it mended all known defects; and that a substantial
period of time elapsed between the launch and the onset of trouble.  
Generally speaking, no more is exigible to satisfy the shipowner's
burden.  See Coryell, 317 U.S. at 409, 412 (explaining that, as a
general rule, due diligence on the shipowner's part   in
particular, hiring competent professionals   suffices to show lack
of culpable knowledge for limitation-of-liability purposes); Porto
Rico Lighterage, 287 F.2d at 509 (similar).
 Here, moreover, the capstone came out of Carr's mouth.  
(In this respect, it bears repeating that he is not only the
claimant, but also an owner of the vessel who served as its
master.)  Carr testified that he would not have set sail on
December 14 if he had any reason to suspect that the ship was
unseaworthy in any aspect.  As the owner with the greatest maritime
expertise and the most access to information about the vessel, his
testimony sheds much light on the lack of culpable knowledge fairly
attributable to the corporation.
 Straining to parry this series of telling thrusts, Carr
notes specific actions (e.g., completely removing the sheathing
rather than merely recaulking portions of the hull) that PMS
omitted during the course of renovations.  But due diligence in the
repair of vessels, as in other settings, is a matter of degree   
and it is almost always for the factfinder, not the appellate
court, to determine what combination of actions suffices.  By like
token, Carr's effort to second-guess the magistrate judge's
credibility determinations fizzles.  He points out that, in the LOL
proceeding, a key witness disavowed earlier testimony in which he
had suggested that the ship must have been structurally unsound.  
But the magistrate, citing the witness's explanation for recanting
his earlier testimony (he explained that, on reflection, he
realized that the ship would have leaked immediately in that
event), explicitly credited the witness's trial testimony.  We have
said with a regularity bordering on the monotonous that, in a bench
trial, credibility calls are for the trier, see, e.g., Sierra Fria
Corp. v. Evans, 127 F.3d 175, 181-82 (1st Cir. 1997); Anthony v.
Sundlun, 952 F.2d 603, 606 (1st Cir. 1991), and we see no basis
here for deviating from this salutary maxim.
 We explore one last facet of Carr's challenge to the
magistrate's findings of fact.  He excoriates with particular vigor
the finding that the F/V JANE & URSULA was seaworthy when she
embarked on her last trip.  The history of the vessel, Carr says,
shows that she was never seaworthy at any time after PMS acquired
her.  In his view, the ship's consistent leaks evidenced a
concealed structural problem and proved persistent unseaworthiness
predating the launch.
 While this inference is not implausible, it is not
inevitable.  For one thing, the painstaking attention given the
ship's condition immediately prior to her final voyage tends to
dispel it and to indicate that the fatal defect developed only
after the ship was at sea.  For another thing, Carr's own
testimony, noted above, belies the inference.  Finally, the March
1991 survey (while far from conclusive) strengthens PMS's hand.  On
this chiaroscuro record, the most that can be said is that the
evidence is susceptible to differing interpretations.
 That ends the matter.  When the proof supports plausible
but competing inferences, the trier's choice between them cannot be
clearly erroneous.  See Jackson v. United States, 156 F.3d 230, 233
(1st Cir. 1998); Cumpiano v. Banco Santander P.R., 902 F.2d 148,
156 (1st Cir. 1990).  So it is here.
                               IV
 We need go no further.  The short of it is that the
magistrate judge did not err either in his application of relevant
legal rules or in his factual findings.  Unlike the F/V JANE &
URSULA, the decision below is watertight.

Affirmed.

</body>

</html>